**March 16, 2017**

# In the Court of Appeals of Georgia

A16A1714. ROGERS v. DUPREE et al.

A16A1715. DUPREE et al. v. ROGERS

A16A1716. COHEN et al. v. ROGERS.

A16A1717. COHEN et al. v. ROGERS

MERCIER, Judge.

These related appeals arise from a suit in the Superior Court of Cobb County, brought by Joseph Rogers, Jr. ("Rogers) against David M. Cohen ("Cohen"), Complex Law Group, LLC, and D.M. Cohen, Inc.; Hylton B. Dupree, Jr. ("Dupree"), Dupree & Kimbrough LLP, and Hylton B. Dupree, Jr., P.C.; and John C. Butters ("Butters"). The Cohen defendants (Cohen and his related entities listed above), the Dupree defendants (Dupree and his related entities listed above) and Butters moved the trial court to dismiss Rogers's claims against them (1) for failure to state a claim pursuant to OCGA § 9-11-12 (b) (6); and (2) pursuant to OCGA § 9-11-11.1,

Georgia's statute regarding strategic lawsuits against public participation (the "anti-SLAPP" statute). The trial court granted the Dupree defendants' motion to dismiss pursuant to the anti-SLAPP statute and denied their motion to dismiss for failure to state a claim (except as to one of the alleged predicate acts for a RICO claim). The court denied the motion by Butters and the Cohen defendants to dismiss pursuant to the anti-SLAPP statute, denied their motion to dismiss for failure to state a claim, and denied their motion to dismiss Rogers's claims or sanction him because of his alleged breach of a mediation agreement.

On appeal, Rogers contends that the trial court erred in granting the Dupree defendants' anti-SLAPP motion to dismiss. The Dupree defendants contend that the court erred in denying their motion to dismiss for failure to state a claim, contending that Rogers's claims are barred by OCGA § 51-7-80 and that Rogers failed to state a tort claims where the defendants had no duty to him. Butters and the Cohen defendants contend that the trial court erred in not dismissing Rogers's claims against them pursuant to the *Noerr-Pennington* doctrine; not dismissing the claims under the anti-SLAPP statute based on the alleged falsity of Rogers's verifications; failing to dismiss the claims or impose a sanction despite finding that Rogers breached a

2

mediation agreement with them; and in holding that Georgia's abusive litigation statute does not bar Rogers's claims and does not apply to pre-litigation conduct.

For the reasons that follow, we reverse the trial court's grant of the Dupree defendants' anti-SLAPP motion as challenged in A16A1714; affirm the trial court's denial of the Dupree defendants' motion to dismiss for failure to state a claim in A16A1715; and affirm the trial court's denial of Butters's and the Cohen defendants' motion to dismiss for failure to state a claim, the denial of their motion to dismiss on anti-SLAPP grounds, and the denial of their motion to dismiss or impose sanctions based on Rogers's alleged breach of the mediation agreement in A16A1716 and A16A1717.

1. Background

Dupree, Cohen and Butters are attorneys who represented Mye Brindle ("Brindle"), who had previously been employed as a housekeeper or personal assistant at Rogers's home. Brindle engaged in sexual activity with Rogers during that employment. In 2008, Brindle was injured and was terminated from her position due to her inability to continue working. She was rehired in 2009 by Rogers and his wife as their housekeeper and house manager. When she returned to work at Rogers's home, the sexual activity between Rogers and Brindle resumed. During her term of

3

employment, Brindle made audio recordings of sexual activity between Rogers and herself, without Rogers's knowledge.

In June 2012, Brindle engaged Butters and Cohen to represent her. On June 20, 2012, after she had engaged Butters and Cohen, Brindle used a camera to record a sexual encounter between Rogers and herself. It is undisputed that Rogers was not aware that he was being recorded and did not consent to the recording. Brindle resigned from her position. On July 16, 2012, Rogers received a letter from Cohen, stating that Rogers had engaged in "a long history of unwelcome sexual demands and other sexual harassment and abuse" towards [Brindle], which was "well documented by numerous video and audio recordings." The letter stated that Brindle was prepared to proceed with a lawsuit and an EEOC complaint, and went on to say:

> It is my experience that these sensitive type matters involving claims of a sexual nature are always best resolved early and outside of public litigation. I have been involved in numerous matters where defendants engaged in a scorched earth strategy of counteraccusations, denial, attempted delay, obfuscation and refusal to address the core issues promptly and properly. Never have I seen that strategy successful. Whether through their own arrogance or "filtered" information and poor advice of defense counsel who seemed more interested in billing and protracted litigation than the best interests of their clients and that of their clients' families, the results were ultimately the same.

4

In virtually all of those situations, the documents, facts, witnesses and other matters that came to light through protracted litigation and media attention drew other private litigation, shareholder derivative demands for immediate removal of those individuals, intrusive governmental investigations, Department of Justice, Attorneys General or SEC involvement, as well as civil and criminal charges that resulted in disgorgement, forfeiture, lengthy incarceration periods in several instances, divorce and the destruction of families.

. . .

My point here is simply to attempt to convey my belief that it is in the best interest of all involved to avoid this type of protracted litigation, injurious publicity to all parties, etc.

Dupree became involved in representing Brindle, along with Cohen and Butters. There is no evidence to demonstrate the exact date on which Dupree was engaged, but it is undisputed that on August 2, 2012, he was involved in this matter. On that date, Rogers's counsel met with Cohen, Butters and Dupree in Dupree's office. On August 6, 2012, Dupree forwarded a segment of the video recording to one of Rogers's attorneys.

On September 14, 2012, Rogers and his counsel participated in mediation with Brindle, Cohen, Butters and Dupree, before which the parties signed a non-disclosure

agreement. The mediation ended without agreement. The same day, Rogers filed a complaint (*Cobb 1*) using pseudonyms and seeking, inter alia, an injunction to prevent Brindle from disseminating the video (the complaint was later amended to include the parties' names). On September 19, 2012, Brindle filed suit in the State Court of Fulton County making claims related to her sexual activity with Rogers. Cohen accompanied Brindle to an appointment at the Atlanta Police Department on September 27, 2012 and a police report was filed September 28, 2012. The record was sealed in the Fulton County action. On October 11, 2012, Brindle dismissed the Fulton County action and instead asserted her claims as counterclaims in *Cobb 1.* On May 30, 2014, Rogers filed the suit in the instant case in the Superior Court of Cobb County (*Cobb 2*).

Rogers's suit in the instant case, *Cobb 2*, alleged against all defendants claims of invasion of privacy- intrusion upon seclusion, solitude and private affairs; invasion of privacy- public disclosure of private acts; civil conspiracy; intentional infliction of emotional distress; conspiracy to violate the Georgia RICO Act; violation of the Georgia RICO Act; aiding and abetting breach of confidential relationship; negligence; and a claim for litigation expenses.

2. Anti-SLAPP Motions

We review de novo the trial court's denial of Cohen and Butters's motion to dismiss. *Barnett v. Holt Builders*, 338 Ga. App. 291, 295 (790 SE2d 75) (2016). Similarly, we review de novo the trial court's grant of Dupree's motion to dismiss. *Project Control Svcs. v. Reynolds*, 247 Ga. App. 889, 891 (1) (545 SE2d 593) (2001). "In reviewing the trial court's order, we construe the pleadings in the light most favorable to the plaintiff with any doubts resolved in the plaintiff's favor." *Emory Univ. v. Metro Atlanta Task Force for the Homeless*, 320 Ga. App. 442, 445 (740 SE2d 219) (2013) (punctuation and footnote omitted.) .

A "strategic lawsuit against public participation" (SLAPP action) is a lawsuit intended to silence and intimidate critics or opponents by overwhelming them with the cost of a legal defense until they abandon that criticism or opposition. In order to protect individuals who speak out on matters of public concern, many states, including Georgia, have adopted anti-SLAPP statutes aimed at curtailing SLAPP lawsuits. Codified at OCGA § 9-11-11.1 (2015), the purpose of Georgia's anti-SLAPP statute is to

> encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech. The General Assembly of Georgia further finds and declares that the valid exercise of the

7

constitutional rights of petition and freedom of speech should not be chilled through abuse of the judicial process.

OCGA § 9-11-11.1 (a). Because the goal of an anti-SLAPP statute is to end a SLAPP lawsuit quickly and without much cost to the defendant, the statute requires that a detailed verification accompany any claim which might infringe on the rights of petition and freedom of speech. OCGA § 9-11-11.1 (b). Subsection (c) of OCGA § 9-11-11.1 defines an "act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern" as including

> any written or oral statement, writing, or petition made before or to a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; or any written or oral statement, writing, or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law.

OCGA § 9-11-11.1 (c). Georgia law is crystal clear that "[f]or the procedural protections of the anti-SLAPP statute to apply, there must be a threshold showing that the claims could reasonably be construed as a statement or petition made in relation

8

to or in connection with an *actual* official proceeding." *Emory Univ.*, supra, at 445 (emphasis supplied.) .

The trial court ruled that Rogers's lawsuit was a SLAPP suit under OCGA § 9-11-11.1, but denied Cohen and Butters's motions to dismiss Rogers's complaint, finding that the statutory verifications filed by Rogers and his counsel were sufficient under OCGA § 9-11-11.1. As to Dupree, the trial court ruled that Rogers's verification was false, finding that "Rogers could not reasonably have believed that his claims regarding the video and [letter] as they pertain to Dupree were well grounded in fact. . . ."

We find that the anti-SLAPP statute does not apply to Rogers's suit in this case. As a threshold matter, we disagree with the dissent that because Rogers did not cross-appeal this specific issue as to Butters and Cohen, we cannot address it. This reasoning is flawed. The anti-SLAPP statute applies *only* to a SLAPP action. As discussed fully below, Rogers's lawsuit is not a SLAPP suit. Accordingly, the trial court did not even need to reach the question of the truthfulness of the verification

because Rogers was not required to submit any verification.[1] See e.g., *Ga. Community Support & Solutions v. Berryhill*, 275 Ga. App. 189, 192 (1) (620 SE2d 178) (2005), affirmed, 281 Ga. 439 (638 SE2d 278) (2006). So, even though Rogers may not have raised the issue in a cross-appeal, under the "right for any reason" rule, this Court "will affirm a judgment if it is correct for any reason, even if that reason is different than the reason upon which the trial court relied." *City of Gainesville v. Dodd*, 275 Ga. 834, 835 (573 SE2d 369) (2002). This rule applies to motions for summary judgment and motions to dismiss, "so long as the movant raised the issue below and the nonmovant had a fair opportunity to respond." *Anderson v. Jones,* 323 Ga. App. 311, 312, n. 2 (745 SE2d 787) (2013). See *Abellera v. Williamson,* 274 Ga. 324, 326 (2) (553 SE2d 806) (2001); *Worley v. Winter Constr. Co.*, 304 Ga. App. 206, 208 (695 SE2d 651) (2010). Since the trial court did not err in refusing to dismiss Rogers's lawsuit because the anti-SLAPP statute does not apply to his claims, the trial

---

[1] We note that it is not inconsistent for a plaintiff to file a verification and then argue that the anti-SLAPP statute does not apply. See *Ga. Community Support & Solutions v. Berryhill*, 275 Ga. App. 189, 192 (1) (620 SE2d 178) (2005), affirmed, 281 Ga. 439 (638 SE2d 278) (2006) (where anti-SLAPP statute does not apply, trial court erred in dismissing plaintiff's complaint on the basis of alleged shortcomings in its verification).

court's order as to Cohen and Butters should be affirmed under the right-for-any-reason rule.[2]

As for Dupree, the trial court noted in its order that Dupree presented no evidence as to when Dupree became involved in the matter. It appears that Dupree was involved at least by August 2, 2012, but may have been involved earlier,[3] and Dupree forwarded the video after that date. Given the inconclusive evidence as to Dupree, and since we construe the pleadings in the light most favorable to the plaintiff, we reverse

[2] The trial court found that the anti-SLAPP statute applied to Rogers's suit as to Butters, Cohen, and Dupree. Although we find here that the court's order should be upheld under the right-for-any-reason rule as to Butters and Cohen, we note that the issue of the applicability of the anti-SLAPP statute underpins the trial court's holdings as to each of these defendants, and is therefore a threshold issue in the analysis of the entire case.

[3] Rogers claims that Dupree is liable under a conspiracy theory, and Georgia law provides that "a conspiracy upon which a civil action for damages may be founded is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. Where it is sought to impose civil liability for a conspiracy, the conspiracy of itself furnishes no cause of action. The gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage. Where the act of conspiring is itself legal, the means or method of its accomplishment must be illegal." *Savannah College of Art & Design v. School of Visual Arts of Savannah*, 219 Ga. App. 296, 297 (464 SE2d 895) (1995) (Citations and punctuation omitted.) Moreover, "[t]he essential element is the common design. And anyone, after a conspiracy is formed, who knows of its existence and purposes and joins therein, becomes as much a party thereto as if he had been an original member." Id. (Citations and punctuation omitted.)

11

the trial court order granting Dupree's motion to strike/motion to dismiss under the anti-SLAPP statute.

In this case, the acts that form the heart of Rogers's claims against the three attorneys involve the making of the videotape, the demand letter, and the continued use of the videotape. The video was made, the letter was sent, and the video was used before any official proceeding was underway and, therefore, do not fall within the scope of OCGA § 9-11-11.1 (c). See *Emory Univ.*, supra; *Ga. Community Support & Solutions*, supra (anti-SLAPP statute inapplicable where no evidence of an official proceeding). See also *Metzler v. Rowell*, 248 Ga. App. 596, 602 (547 SE2d 311) (2001) (Eldridge, dissenting) (disagreeing with majority's holding that anti-SLAPP applied because defendants' tortious conduct had no direct relationship with either the previous rezoning application or the pending suit appealing such denial). Compare *Hindu Temple & Community Center of High Desert v. Raghunathan*, 311 Ga. App. 109, 114 (1) (714 SE2d 628) (2011); *Adventure Outdoors v. Bloomberg*, 307 Ga. App. 356, 360 (2) (705 SE2d 241) (2010) (anti-SLAPP statute applied and plaintiff was required to file a verification because his claims related to an issue under consideration by a judicial body, specifically, a lawsuit filed in federal court).

Additionally, the activities about which Rogers complains were not valid activities undertaken by Butters, Cohen, and Dupree in furtherance of their constitutional right to free speech or right of petition. Georgia's anti-SLAPP statute is virtually identical to California's anti-SLAPP statute. Compare OCGA § 9-11-11.1 and Cal. C. C. P. § 425.16. In 2006, the Supreme Court of California reviewed a similar case where a well-known entertainer sued an attorney in response to a demand letter and the attorney sought to invoke California's anti-SLAPP statute. See *Flatley v. Mauro*, 39 Cal. 4th 299 (139 P.3d 2) (2006). While that case does not constitute precedent for this Court, it is instructive in our analysis. *Flatley* rejected application of the anti-SLAPP statute on the grounds that the action was not a constitutionally protected activity. In that case, the plaintiff sued for extortion, defamation, fraud, intentional infliction of emotional distress, and wrongful interference with prospective economic advantage. Id. at 306. The demand letter underlying the claims alleged that the plaintiff had engaged in a forcible sexual assault upon the defendant attorney's client and demanded a settlement. The letter threatened the plaintiff with a civil lawsuit as well as unwanted publicity and warned that all information involving the alleged assault and the plaintiff's assets would be turned over to the IRS, immigration officials, and other governmental authorities. The letter further cited an unidentified

13

case where the alleged victim was awarded $100,000,000 in punitive damages. Id. at 307-310. The letter stated that it was "governed by. . . Rule 408 of the U.S. Federal Rules of Evidence." Id. at 307.

Similarly, the letter in the instant case refers to video evidence of Rogers's alleged sexual abuse of Brindle and mentions the results of previous cases wherein the defendants who "engaged in a scorched earth strategy" ended up facing criminal charges, immediate removal from company positions, unwanted publicity, government investigations by the Department of Justice, Securities and Exchange Commission and Attorney General, lengthy incarcerations, divorce, and the destruction of their families. The letter insinuates that Rogers will face similar "problems" should he elect not to settle the matter with Brindle. Similarly to the letter in *Flatley* – and as noted by the dissent – the letter in the instant case states: "This letter is sent pursuant to FRE 408 for purposes of settlement and compromise."

The dissent implies that the demand letter could not constitute attempted extortion as alleged by Rogers because it was sent pursuant to OCGA § 24-4-408 for purposes of settlement and compromise. Including the phrase "FRE 408" in a letter, however, does not automatically cloak it with constitutional protections. Just as the letter in *Flatley* threatened the plaintiff in that case, the letter here threatened to ruin

14

Rogers's reputation, position, and family, and insinuated that the allegations would result in various government agencies pursuing him for prosecution and possibly lengthy incarceration if he did not settle the matter with Brindle.

As for the making of the videotape, under Georgia law, "[i]t shall be unlawful for . . . [a]ny person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view." OCGA § 16-11-62 (2). The attorneys' alleged involvement in this regard was tortious and criminal and, thus, not within the protected activity defined by the anti-SLAPP statute. See, e.g., *Gerbosi v. Gaims, Weil, W. & Epstein,* 193 Cal. App. 4th 435 (122 Cal. Rptr. 3d 73) (2011) (plaintiff's wiretapping claim against attorney and attorney's client not subject to protections of anti-SLAPP statute). Moreover, their status as attorneys assisting a client does not bring their actions under the protective cloak of the anti-SLAPP statute. The dissent stresses that "no court or jury has determined that the making of the video was illegal," and that "the issue of the video's legality is unsettled." But there is no requirement in Georgia law that a criminal conviction be obtained against defendants in order for a plaintiff to bring a civil suit against them, or in order for the underlying criminal and tortious issues to lie outside the purview of the anti-SLAPP statute.

15

Here, Rogers seeks to recover for the making of an illegal video, theft of financial information, public disclosure of private facts, and extortion, *not* the refusal to dismiss Brindle's various civil pleadings. There is a fundamental difference between alleged criminal and tortious acts done in furtherance of litigation, and acts done in furtherance of litigation that, although bothersome, are arguably legitimate. Given the nature of Rogers's claims against Butters, the Cohen defendants and the Dupree defendants, the anti-SLAPP statute does not apply and the dissent fails to address this threshold issue.

Therefore, we reverse the trial court's finding that the anti-SLAPP statute applies to Rogers's claims against Dupree, and affirm the trial court's denial of Butters and the Cohen defendants' motion to strike Rogers's complaint. This renders moot Rogers's remaining enumerations of error in A16A1714, regarding the trial court's findings as to the anti-SLAPP verifications and the trial court's order quashing Rogers's subpoenas for the anti-SLAPP hearing.

3. Motions to Dismiss for Failure to State a Claim

The trial court did not err in holding that Rogers's claims are not precluded by Georgia's abusive litigation statute, OCGA § 51-7-80 et seq. OCGA § 51-7-81 provides that "[a]ny person who takes an active part in the initiation, continuation, or

16

procurement of civil proceedings against another shall be liable for abusive litigation if such person acts: (1) With malice; and (2) Without substantial justification." OCGA § 51-7-85 provides that "[n]o claim other than as provided in this article or in Code Section 9-15-14 shall be allowed, whether statutory or common law, for the torts of malicious use of civil proceedings, malicious abuse of civil process, nor abusive litigation. . . .This article is the exclusive remedy for abusive litigation." Butters and the Cohen defendants argue that plaintiffs may not avoid the requirements of the abusive litigation statute by describing their claims as "some other cause of action." They further argue that the "initiation" and "procurement" of civil proceedings include "the process leading to" civil proceedings. Dupree makes similar arguments, contending that the abusive litigation statute is Rogers's sole remedy and applies to pre-litigation conduct, and also arguing that Brindle's attorneys had no duty to Rogers and thus Rogers cannot state a claim against him for certain torts. However, as explained above, Rogers's claims are based on the allegedly criminal and tortious conduct of the defendants. We agree with the trial court that the initial investigation of a case and the "procurement" of civil proceedings are distinguishable from the "active involvement of creating additional evidence, especially illegal evidence."

4. *Noerr-Pennington*

We also affirm the trial court's rulings with regard to the other contentions raised by Butters and the Cohen defendants in A16A1716 and A16A1717. First, we agree with the trial court that the *Noerr-Pennington*[4] doctrine does not bar Rogers's claims. Because the application of this doctrine is a question of law, we review this issue de novo. *Ga. Dept. of Natural Resources v. Center for a Sustainable Coast, Inc.* 294 Ga. 593, 596 (2) (755 SE2d 184) (2014). Butters and Cohen assert that the *Noerr-Pennington* doctrine protects both direct petitioning activity and conduct incidental to that petitioning activity, and that "[t]he vast majority of Rogers's claims are based on" petitioning activity. However, Rogers's claims against Butters and the Cohen defendants arise from alleged conduct that is not protected by the First Amendment. The case centers on Rogers's allegations that the defendants engaged in an extortion scheme involving illegally obtained evidence and related torts and crimes. Such conduct is not protected by the First Amendment. See *United States v. Stevens*, 559 U.S. 460, 468 (II) (130 SCt 1577, 176 LEd2d 435) (2010); *Denton v. Browns Mill Dev. Co.*, 275 Ga. 2, 6 (561 SE2d 431) (2002).

---

[4] See *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (81 SCt 523, 5 LEd 2d 464) (1961); *Mine Workers v. Pennington*, 381 U.S. 657 (85 SCt 1585, 14 LEd 2d 626) (1965).

5. Breach of Mediation Agreement

With regard to Butters and the Cohen defendants' contention that the trial court erred in failing to dismiss Rogers's claims as a result of his alleged breach of the mediation agreement, we agree with the trial court that "[t]his case is not at all about the amount of the mediation demand," and that "it is the attempt to obtain money, not the amount of money sought that is relevant." The gravamen of the case is the allegation that "a party obtained evidence in violation of Georgia law" and that "she obtained her counsel's advice and assistance in obtaining that evidence." The trial court did not err in failing to dismiss Rogers's claims as a result of his alleged breach of the mediation agreement.

For these reasons, we affirm the trial court's denial of Butters's and the Cohen defendants' motions to dismiss; affirm the trial court's denial of Dupree's motion to dismiss for failure to state a claim; and reverse the trial court's grant of Dupree's motion to dismiss based on the anti-SLAPP statute.

*Judgments affirmed in Case Nos. A16A1715, A16A1716, and A17A1717. Judgment reversed in Case No. A16A1714. Miller P. J., Ellington P. J., McMillian, Reese and Self, JJ., concur. Branch, J., concurs in judgment only. Barnes, P. J., and McFadden, P. J., concur in part and dissent in part.*

19

A16A1714-A16A1717. ROGERS v. DUPREE et al.

BARNES, Presiding Judge, concurring in part and dissenting in part.

Because the trial court erred in denying Butters and Cohen's motions to dismiss and did not err in granting Dupree's motion to dismiss, I respectfully dissent in part from the majority opinion.[1] Rogers' claims against all three lawyers should be dismissed under the Georgia Anti-Strategic Litigation against Public Participation Statute (Anti-SLAPP Statute), OCGA § 9-11-11.1. Additionally, because Rogers seeks damages solely for the conduct of counsel undertaken to pursue litigation on their client's behalf, Rogers' claims should be dismissed under the exclusive remedy provision of the abusive litigation statute, OCGA § 51-7-85. Finally, Rogers' claims should be dismissed because they are based on a demand letter and mediation proceedings he had agreed to keep confidential.

A truncated overview of these proceedings is necessary to analyze the trial court's orders on appeal in this case. Mye Brindle was formerly employed as a housekeeper for Rogers. Brindle sought legal counsel regarding the claims she wanted to bring against Rogers for sexual harassment. The first attorney she saw, whom she

---

[1] I concur fully in Division 1.

did not hire and is not involved in this litigation, commented that Brindle did not have video evidence and the audio recordings she had made could be disputed. Brindle then retained Cohen and Butters. In June 2012, she made an audio-video recording of herself and Rogers, without his knowledge, while the two engaged in a sexual encounter.

On June 16, 2012, Cohen sent Rogers a letter on behalf of Brindle, stating that Brindle was "prepared to proceed with a lawsuit," but wanted to give Rogers the opportunity to review the issues and "attempt to resolve the matter outside of litigation." ««v1a. 37 (Ex. to complaint)» Id.»

Cohe In his experience, he said, cases in which defendants instead "engaged in a scorched earth strategy" were never successful, but instead

> the documents, facts, witnesses and other matters that came to light through protracted litigation and media attention drew other private litigation, shareholder derivative demands for the immediate removal of those individuals, intrusive government investigations, Department of Justice, Attorneys General or SEC involvement, as well as civil and criminal charges that resulted in disgorgement, forfeiture, lengthy incarceration periods in several instances, divorce and the destruction of families.

Ironically, all of those same defendants also eventually settled the civil cases we filed. On the other hand, I have not been involved in any matters where the same problems resulted to any defendants that promptly and fully addressed the issues prior to the initiation of litigation and public focus on the issues.

My point here is simply to attempt to convey my belief that it is in the best interest of all involved to avoid this type of protracted litigation, injurious publicity to all parties, etc.

In summary, I am writing to explore the possibility of scheduling a meeting within the next two weeks with you and/or your counsel to engage in early and substantive discussions focused on resolution of this matter, including a release of all potential claims, past and future. We would of course agree that any meeting, including anything discussed thereat, be treated as confidential and inadmissible.

If you would like to discuss this matter before we proceed with litigation, please contact me by close of business on Monday July 23, 2012. If we do not hear from you or your counsel before then, we will move forward and assert all available claims for relief.

Below Cohen's signature line is the following notation: "*This letter is sent pursuant to FRE 408 for purposes of settlement and compromise."[2]

Rogers' attorney contacted Cohen shortly afterward and on July 21, 2012 sent an email message thanking Cohen for sending a copy of the "demand letter," indicating he would consult Rogers about pre-suit mediation, and seeking "a pre-mediation demand that is realistic before moving forward." On August 1, 2012, Cohen sent Rogers' attorney a letter to follow up on their phone call, again noting that the letter was sent pursuant to FRE 408 for purposes of settlement and compromise. After observing that jury verdict research in sexual harassment cases involving "high net worth individuals" was limited because most were resolved pre-trial, Cohen described and included copies of several multi-million dollar verdicts, apparently to illustrate that Brindle's demand would be substantial or that Rogers' exposure was substantial. Those verdicts included one for $95 million, later reduced to $41.3 million, against an Atlanta-based company, and one from Florida for $5,378,863. Cohen, Butters, and Dupree, who had joined Brindle's legal team, then met with Rogers' attorneys, who

---

[2]Federal Rule of Evidence (FRE) 408 addresses prohibited uses and exceptions to the admissibility of offers of compromise or settlement. As discussed further infra, OCGA § 24-4-408 tracks the language of the federal rule and generally excludes the use in evidence of offers to compromise. See *Frost v. Frost*, 299 Ga. 278, 282 (4) (787 SE2d 693) (2016).

reviewed the video evidence, and the parties agreed to attend a pre-litigation mediation session with a mediator of Rogers' choosing.

Meanwhile, unknown to Cohen, Butters, Dupree, or Brindle, Rogers' attorney had emailed a seven-page letter to the Fulton County District Attorney (the D.A.) on August 20, 2012, "to follow up on [their] recent conversation concerning [Rogers,] who is the victim of a blackmail/extortion scheme." The letter to the D.A. described the audio-video recording and research by Roger's attorney into the crimes of attempted extortion, unlawful video surveillance, and the unlawful distribution or threatened distribution of the video. While conceding Rogers had "tentatively agreed to try and resolve this dispute via mediation which is scheduled for September 14," the letter to the D.A. stated that Rogers and his attorneys were "not optimistic that the case can be resolved." In conclusion, Rogers' attorney asked the D.A. to investigate Brindle, and expressed that he and his client were "also concerned that [Brindle] and her mother may have engaged in mortgage and HUD fraud and other very questionable activities."[3] [4]

---

[3]On September 25, 2012, Rogers sent a similar email letter to an Assistant United States Attorney for the Northern District of Georgia (the AUSA) in an attempt to have federal criminal charges brought against Brindle. Rogers and his wife met with the AUSA on October 5, 2012. Rogers' wife sent a follow-up email to the AUSA in February 2013, detailing the litigation events to date and "begging [him] to reconsider

5

Brindle, Rogers, Rogers' wife, and their attorneys signed a contract before the September 14, 2012 mediation began, agreeing to keep the proceedings confidential. During the mediation, Brindle offered to settle her claims against Rogers for $12 million. Rogers countered with an offer to pay Brindle $100,000.

At 3:31 p.m. during the mediation session, one of Rogers' attorneys was filing suit against Brindle, using pseudonyms, in Brindle's resident county of Cobb ("*Cobb*

_____

getting involved in this crime."

[4]I express no opinion whether the participation of Rogers' attorneys in obtaining or attempting to obtain criminal charges against Brindle, Dupree, Cohen, and Butters constitutes a violation of Rule 3.4 (h) of the Georgia Rules of Professional Conduct. That rule provides that a lawyer shall not "present, participate in presenting or threaten to present criminal charges solely to obtain an advantage in a civil matter." See *Cornelius v. Auto Analyst*, 222 Ga. App. 759, 762 (2) (d), n.2 (476 SE2d 9) (1996) (noting that ethics rules "prohibit[] attorneys from threatening to bring criminal charges to gain an advantage in a civil matter"). See also *East River Savings Bank v. Steele*, 169 Ga. App. 9, 12 (1) (311 SE2d 189) (1983) ("A violation of this rule is subject to disciplinary action by the State Bar of Georgia."); Ethical Consideration 7-21 from former Canon of Ethics ("The civil adjudicative process is primarily designed for the settlement of disputes between parties, while the criminal process is designed for the protection of society as a whole. Threatening to use, or using, the criminal process to coerce adjustment of private civil claims or controversies is a subversion of that process; further the person against whom[] the criminal process is so misused may be deterred from asserting his legal rights and thus the usefulness of the civil process in settling private disputes is impaired. As in all cases of abuse of judicial process, the improper use of criminal process tends to diminish public confidence in our legal system.").

*1*"). In his *Doe v. Smith* complaint, Rogers alleged that during the course of defendant "Smith's" employment as a housekeeper at "Doe's" residence, Doe and Smith "became engaged in [a] sexual relationship." Rogers also alleged that the defendant had "threatened to proceed with litigation and reveal [recordings of their sexual encounters] if Plaintiff does not agree to pay her 'millions' of dollars." Rogers later admitted that the only monetary demand he had received at that time was during the confidential mediation proceeding. Rogers included "Smith's" home address in the complaint, sought injunctive relief from the court regarding the evidence against him, and asserted claims for invasion of privacy and intentional infliction of emotional distress. The mediation session ended without resolution an hour and a half after Rogers' suit was filed.

On September 17, 2012, Rogers amended his *Doe v. Smith* complaint in *Cobb 1*. Instead of alleging that he and Smith became engaged in a sexual relationship while Smith was employed at his residence, the amended complaint alleged that Doe and Smith "became engaged in an infrequent, but consistent, series of consensual non-intercourse sexual encounters" while Smith was employed with WH Capital as a housekeeper at his residence.

After a hearing on September 17, 2012 to address Rogers' emergency motion to seal the record in *Cobb 1*, on September 19, 2012, the trial court denied the motion, finding that under Uniform Superior Court Rule (USCR) 2.1, the court was required to specify reasons for restricting public access to court files and Rogers had "presented no evidence whatsoever" to support sealing the record, only argument. Further, the trial court noted that under USCR 21.2, an order limiting access must include "a finding that the harm otherwise resulting to the privacy of a person in interest clearly outweighs the public interest." Not only did Rogers fail to present evidence that would support such a finding, the trial court found, he had included sufficient information in the amended complaint filed moments after the hearing ended "to make it easy for someone to identify the parties" by listing the defendant's home address and her place of employment, from which research would reveal both parties' identity. Finally, the trial court denied Rogers' request for an injunction, finding he had presented "no verified filings and no evidence."

Also on September 19, 2012, Brindle filed a complaint against Rogers in Fulton County, asserting claims of battery, intentional infliction of emotional distress, and violations of the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act. A few hours later, Rogers filed an amended complaint in *Cobb 1*, using the

8

parties' real names. Brindle ultimately dismissed her Fulton County suit without prejudice on October 10, 2012, and filed an answer and counterclaim in the *Cobb 1* that mirrored her Fulton County complaint.

Rogers successfully pursued an award of attorney fees in the Fulton County case against both Brindle and Cohen. That award was vacated by this Court in an unpublished opinion and the case was remanded for further proceedings. (See *Brindle v. Rogers*, 328 Ga. App. XXIV (July 16, 2014) (unpublished)). Upon remand, the Fulton Court granted a fee award to Rogers against only Cohen, and that award was the basis for the separate appeal in *Cohen v. Rogers*, ___ Ga. App. ___ (Case Number A16A1858, decided March 16, 2017). The majority in that opinion affirmed the trial court's award of almost $200,000 in attorney fees to Rogers.

Meanwhile, litigation continued in *Cobb 1* and the parties conducted discovery and filed multiple pleadings. Eventually, in response to Rogers' motion to compel discovery responses from Brindle, the trial court in *Cobb 1* held a closed ex parte hearing with Brindle and her counsel regarding the circumstances surrounding the making of the video recording, which resulted in an order granting Rogers' motion to compel limited discovery as to issues otherwise protected by the attorney-client

privilege.[5] This Court granted Brindle's application for an interlocutory appeal of that order, which was affirmed in the same unpublished opinion referenced supra. See *Brindle*, 328 Ga. App. XXIV.

After the remittitur issued from this Court in *Cobb 1*, the trial court granted Rogers' motion to disqualify Cohen and Butters from representing Brindle, finding, among other things, that the lawyers had an unwaivable conflict of interest. This Court again granted Brindle's application for interlocutory appeal and determined first that

> the trial court's interim discovery order in *Cobb 1* did not adjudicate dispositively the question of whether Brindle violated a criminal statute by making the video recording of herself and Rogers. The trial court made an interim discovery ruling granting Rogers' motion to compel discovery responses and finding that Brindle could not claim the attorney-client privilege with regard to the limited, specific areas outlined previously. In that June 2013 order, the trial court specifically held that "the crime-fraud exception does not require proof of the existence of a crime or fraud to overcome the claim that communication is privileged," but only that a prima facie case be made that the exception applied. The court further explicitly stated that it was not determining "whether or not [Brindle] has committed a crime beyond a reasonable doubt or whether the State could disprove any defenses she may assert" in the future, made

---

[5]The video and audio recordings Brindle took have been held under seal by the trial court since 2012, and have never been published.

10

"no findings as to Cohen's and Butter's involvement" in making the recording, and decided only that "discovery may be had on that issue."

*Cohen v. Rogers*, 338 Ga. App. 156, 161-162 (1) (789 SE2d 352) (2016). This Court then affirmed the trial court's order of disqualification. Id. at 169 (4) (b).[6]

Meanwhile, while *Cobb 1* was on appeal, Rogers filed a second complaint in Cobb County against Brindle's attorneys, Dupree, Butters, Cohen, and their professional corporations (*Cobb 2*), which is the basis for the current appeal. In his complaint, Rogers contended that Brindle approached the attorneys to assist her "in attempting to extract money from Rogers[, and] [r]ecognizing that there was no evidence to support any legal claims, Defendants designed a scheme and conspired to extort money from Rogers." All of the actions ascribed to the attorneys were alleged to be in furtherance of this "scheme," including their alleged participation in assisting Brindle with recording what the complaint characterized as "a consensual sex act," sending a demand letter, participating in mediation, and filing pleadings in trial and appellate courts.

---

[6]Cohen and Rogers' August 3, 2016 petition for a writ of certiorari to the Georgia Supreme Court from this Court's opinion affirming the disqualification order in *Cobb 1* remains pending. See *Brindle v. Rogers*, Case No. S17C0036.

Rogers stated nine causes of action against Brindle's lawyers in *Cobb 2*: invasion of privacy – intrusion upon seclusion, solitude and private affairs; invasion of privacy – public disclosure of private facts; civil conspiracy; intentional infliction of emotional distress; conspiracy to violate the RICO Act; violation of the RICO Act; "aiding and abetting breach of confidential relationship"; and conduct supporting a claim for litigation expenses under OCGA § 13-6-11. Upon the defendant lawyers' request, Rogers and his counsel filed verifications pursuant to the anti-SLAPP statute, OCGA § 9-11-11.1.

Cohen, Butters, and Dupree answered the complaint and filed motions to dismiss for failure to state a claim under OCGA § 9-11-12 (b) (6) and for violation of the anti-SLAPP statute. They also argued that Rogers' complaint was premature because his sole remedy was under the provisions of the abusive litigation statute, OCGA § 51-7-80 et seq., which requires that the underlying litigation be completed before such claims are filed.

In April 2015, the trial court in *Cobb 2* denied the lawyers' motions to dismiss for failure to state a claim, finding that Rogers had sufficiently stated claims for relief under all nine counts, except for one of the alleged predicate acts in his claim that the lawyers violated or conspired to violate the RICO Act. The trial court also found that

12

Rogers' suit against the lawyers was not preempted by the abusive litigation statute.

The trial court in separate orders found that the anti-SLAPP statute applied to Rogers' claims against Dupree, Cohen, and Butters, because Brindle's counterclaims against Rogers in *Cobb 1* "could reasonably be construed as an act in furtherance of . . . the right to petition the government for redress of grievances . . . in . . . connection with an issue of public interest or concern," paraphrasing OCGA § 9-11-11.1 (b) (1). The trial court held that its next consideration would be to determine whether Rogers' verification of his lawsuit was false under the anti-SLAPP statute, and invited the parties to move for discovery on that limited issue before the court scheduled an evidentiary hearing. The court also gave the parties notice of its intention to take judicial notice of the entire record in *Cobb 1*, about which it would hear from the parties at the evidentiary hearing.

Cohen, Dupree, and Butters sought and were granted permission to depose Rogers for the limited purpose of gathering evidence on whether his verification was false under the anti-SLAPP statute. After the deposition, the court scheduled an evidentiary hearing. Rogers did not request discovery. Instead, he subpoenaed the three defendant lawyers to compel them to testify at the hearing, but the trial court granted the defendants' motion to quash the subpoenas.

13

Following a two-day hearing at which the parties submitted over 3,000 pages of exhibits, the trial court granted Dupree's motion to dismiss with prejudice Rogers' complaint against him under the anti-SLAPP statute, finding that Dupree did not represent Brindle when the video was made or the demand letter was sent, the two acts which the trial court found to form "the gravamen of Rogers' claims." The trial court further found that the acts that Rogers alleged "made Dupree a co-conspirator were nothing more than his representation of his client." The trial court also found that Rogers' allegations that Dupree leaked information about the case to the media were "inextricably intertwined with the video and demand/extortion letter," and that since Dupree had nothing to do with either of those acts, Rogers' claims against Dupree on that ground also failed.

In contrast, the trial court denied Cohen and Butters' motion to dismiss under the anti-SLAPP statute, finding that the verifications of Rogers and his counsel were not false because it was reasonable for them to conclude that Cohen and Butters had assisted Brindle in making an illegal video, that the letter they sent to Rogers was "unlawful," and that Cohen and Butters had caused the disclosure of private information to the public through the media.

The majority reverses the trial court's grant of Dupree's motions to dismiss and affirms the denial of Cohen and Butters' motions to dismiss, leaving this litigation to proceed against Brindle's lawyers while the litigation between Rogers and Brindle continues.

1. *The Anti-SLAPP Statute.* First, the anti-SLAPP statute applies to all of Rogers' claims against his opponent's attorneys. Rogers argues that the trial court erred in finding that the anti-SLAPP statute applied to his claims against Dupree because those claims arise from criminal and tortious conduct, and because Brindle's counterclaim in *Cobb 1* does not involve issues of public interest and concern.

As stated in its opening declaration, the purpose of Georgia's anti-SLAPP statute is "to encourage citizen participation in matters of public significance through the exercise of the right of free speech and the right to petition the government for redress of grievances, and to prevent their valid exercise from being chilled through abuse of the judicial process." *Atlanta Humane Society v. Harkins*, 278 Ga. 451, 452 (1) (603 SE2d 289) (2004). See OCGA § 9-11-11.1 (a).[7]

---

[7]OCGA § 9-11-11.1 was amended in 2016, effective July 1, 2016. See Ga. L. 2016, p. 341, § 2/HB 513. The amendment expanded the scope of protected speech to include any conduct on a matter of public concern in furtherance of the exercise of a right to petition, not just speech connected to an official proceeding (subsection (c) (4)), replaced the verification requirement with a probability-of-success standard

15

> SLAPP suits are typically tort actions that depend on a claim of damages, real or otherwise, caused by the actions or words of the accused person or group. Typically, SLAPP plaintiffs claim defamation, interference with business relationships, or abuse of process. While the types of claims are different, what makes a suit a "SLAPP suit" is the intent of the plaintiff in filing the action. Rather than seeking redress for injury, the SLAPP plaintiff files suit in an effort to prevent individual citizens or public interest groups from speaking out on issues of public concern. . . . [T]he goal of the litigation is to delay, restrict, or reduce future citizen speech, and change the focus of the controversy.

Comment on OCGA §§ 9-11-11.1, (new), 51-5-7 (amended), 13 Ga. St. U.L. Rev. 23, 24 (1996) (footnotes omitted.).

The statute defines an "act in furtherance of the right of free speech or the right to petition government for a redress of grievances under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern" to include a lawsuit ("any written or oral statement, writing, or petition made before or to a . . . judicial proceeding, . . . or any written or oral

---

(subsection (b) (1)), and provided a right to direct appeal from the grant or denial of a motion to dismiss under the statute (subsection (e)). Unless otherwise noted, further citations to the statute in this dissent refer to the prior version of the statute, which is applicable in this case.

statement, writing, or petition made in connection with an issue under consideration or review by a . . . judicial body"). OCGA § 9-11-11.1 (c).

> In analyzing the breadth of conduct protected by the statute, we note that this Court has previously held that OCGA § 9-11-11.1 creates an expansive definition of protected speech, which includes any statement made to any official proceeding authorized by law; or any statement made in connection with an issue under consideration by any official proceeding. See OCGA § 9-11-11.1 (c).

*Hagemann v. Berkman Wynhaven Assoc.*, 290 Ga. App. 677, 681 (660 SE2d 449) (2008) (citation, punctuation, and emphasis omitted).

"Although anti-SLAPP statutes vary significantly, they typically provide for an early means of testing the bona fides of the plaintiff's claim and for some combination of costs, legal fees and damages to be awarded to the defendant for the plaintiff's initiation of *groundless* litigation." *Harkins*, 278 Ga. at 452 (1). (Citation and punctuation omitted; emphasis in original). To avoid abuse of the judicial process, "the statute provides that a claim that could reasonably be construed as infringing upon these rights must be accompanied by a detailed verification" by both the plaintiff and his attorney. *Metzler v. Rowell*, 248 Ga. App. 596, 597-598 (1) (547 SE2d 311) (2001). See OCGA § 9-11-11.1 (b).

California's anti-SLAPP statute differs markedly from the Georgia statute at issue here, which included a verification requirement, although the 2016 amendment to the Georgia statute now echoes California's evidentiary standard requiring the plaintiff to show "a probability that the plaintiff will prevail on the claim." Cal Code Civ Proc § 425.16 (2017); OCGA § 9-11-11.1 (b) (1) (2016). Until Georgia's appellate courts apply the 2016 anti-SLAPP statute, the persuasive value of California cases is limited. The California Supreme Court decision in *Flatley v. Mauro*, 139 P3d 239 (Cal. 2006), is an outlier. There, the court affirmed a trial court's denial of a motion to dismiss a complaint against a lawyer under that state's anti-SLAPP statute, holding that the defendant lawyer's demand letter and follow-up phone calls to the plaintiff-entertainer "constitute[d] criminal extortion as a matter of law." Id. at 330. The court noted that its ruling was "based on the specific and extreme circumstances of this case," Id. at 332, n. 16, The demand letter in *Flatley* bears no resemblance to the demand letter here, nor did the lawyers in this case follow up their letter with threatening phone calls.

> In subsequent analysis, the California Court of Appeals interpreted *Flatley's*
>
> use of the phrase "illegal" . . . to mean criminal, and not merely violative
> of a statute. First, the court in *Flatley* discussed the attorney's underlying
> conduct in the context of the Penal Code's criminalization of extortion.

Second, a reading of *Flatley* to push any statutory violation outside the reach of the anti-SLAPP statute would greatly weaken the constitutional interests which the statute is designed to protect. As [the defendant] correctly observes, a plaintiff's complaint always alleges a defendant engaged in illegal conduct in that it violated some common law standard of conduct or statutory prohibition, giving rise to liability, and we decline to give plaintiffs a tool for avoiding the application of the anti-SLAPP statute merely by showing any statutory violation.

*Mendoza v. ADP Screening & Selection Services*, 107 Cal. Rptr.3d 294, 303 (Cal. Ct. App. 2010).

In the Georgia statute applicable to this case, the verifications had to first certify that the party and his attorney have read the claim. They also must certify (1) that the claims against the defendant are well grounded in fact and existing law or in a good faith argument for the extension, modification, or reversal of existing law, (2) that the act forming the basis for the claim was not a privileged communication under OCGA § 51-5-7 (4),[8] and (3) "that the claim is not interposed for any improper purpose such as to suppress a person's or entity's right of free speech or right to petition

---

[8]OCGA § 51-5-7 (4) defines "privileged" communications as including "[s]tatements made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern, as defined in subsection (c) of Code Section 9-11-11.1."

government, or to harass, or to cause unnecessary delay or needless increase in the cost of litigation." OCGA § 9-11-11.1 (b).

If the claim requires a verification, the court is required to dismiss it with prejudice if a verification is not filed "within ten days after the omission is called to the attention of the party asserting the claim." *Hawks v. Hinely*, 252 Ga. App. 510, 514 (1) (c) (556 SE2d 547) (2001). See OCGA § 9-11-11.1 (b).

If a defendant believes the suit against him violates the anti-SLAPP statute, he may file a motion to dismiss or strike the claim on that ground. OCGA § 9-11-11.1 (b). If the trial court determines that the statute applies and the procedural requirements of filing the verification are met, "the court must take a substantive look at the verification offered to ensure that the underlying lawsuit has not been initiated for an improper purpose." *Harkins*, 278 Ga. at 454 (1) (citation and punctuation omitted.)[9] "The mechanical filing of a verification with the complaint, therefore, does not preclude dismissal if the claim is found by the trial court to infringe on the rights of free speech or petition as defined by the statute." *Metzler*, 248 Ga. App. at 598 (1).

---

[9]The trial court is authorized to receive evidence during an OCGA § 9-11-11.1 hearing on a motion to dismiss without converting the motion into one for summary judgment. *Metzler*, 248 Ga. App. at 600 (3).

20

If the trial court finds that the claim was falsely verified — that is, that the claim was not grounded in fact and law, or that the act forming the basis for the claim was a privileged communication under OCGA § 51-5-7 (4), or that the claim was interposed for a improper purpose — the statute directs the court to impose sanctions. Those sanctions "which may include dismissal of the claim and an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, including a reasonable attorney's fee." OCGA § 9-11-11.1 (b).

This Court reviews de novo the grant or denial of a motion to dismiss under the anti-SLAPP statute. See *Barnett v. Holt Builders*, 338 Ga. App. 291, 295 (790 SE2d 75) (2016). "In reviewing the trial court's order [in an anti-SLAPP case], we construe the pleadings in the light most favorable to the plaintiff with any doubts resolved in the plaintiff's favor." *Emory Univ. v. Metro Atlanta Task Force for the Homeless*, 320 Ga. App. 442, 443 (740 SE2d 219) (2013).

(a) *The Application of OCGA § 9-11-11.1 to Rogers' Claims against Dupree.* In this case, the trial court found that the anti-SLAPP statute applied to Rogers' claims against Brindle's lawyers. It then found that the verifications by Rogers and his counsel were "false" as to Dupree and dismissed Rogers' claims against him with

21

prejudice.[10] Rogers argues first that the trial court erred in finding as a threshold matter that the anti-SLAPP statute applied to Rogers' claims against Dupree and that a verification was required. The trial court found that the statute applied because "Brindle's counterclaims, asserted by Dupree as her attorney in the related litigation[,] 'could reasonably be construed as an act in furtherance of the right to petition the government for redress on an issue of public interest or concern.'"[11]

(i) *An Issue of Public Interest or Concern.* Rogers argues that Brindle's sexual harassment counterclaims in *Cobb 1* did not involve issues of sufficient public concern or interest to be protected by the anti-SLAPP statute. While he concedes "that the fair resolution of sexual harassment claims and the elimination of sexual harassment are matters of general public interest," Rogers then argues that "Brindle's

---

[10]The trial court entered a consent order staying Dupree's subsequent motion for an award of attorney fees and expenses pending the resolution of this appeal.

[11]While Dupree asserts that Rogers waived his right to challenge the application of the anti-SLAPP statute by voluntarily filing the verifications required by the statute, Rogers has consistently maintained that the statute does not apply, and that he simply filed the verification as a precaution. Filing a verification in response to Dupree's claim that the statute applies does not constitute a concession that the statute applies; it is simply a defensive measure in case the trial court decides that the statute does apply. Thus, Rogers did not waive the issue by filing the verification.

claims arise from a private, consensual relationship between her and Rogers and the resolution of such claims will only impact a limited number of individuals."

Rogers cites to no evidence in the record showing that Brindle shares his characterization of their relationship. To the contrary, Brindle has consistently disputed that she and Rogers had a consensual relationship, instead characterizing their relationship as strictly employer-employee and claiming that any sexual interaction between them occurred because it was required for her to maintain her job.

For instance, during her deposition, when Rogers' counsel asked Brindle what she had told a friend about her "relationship" with Rogers, Brindle answered, "The only relationship Joe and I had, and I've said it a million times, and I'll tell you again, is a business relationship. He was my boss. I was his employee." When asked if she had not felt that she had a "great relationship" with Rogers and his wife before 2012, Brindle replied, "[Y]ou keep wanting to make it seem like we had a friendship or that I was part of the family. There was a distinct difference. I worked for them. I was their help in their home. We weren't friends. We didn't talk about anything personal."

Brindle further testified that when Rogers asked her to give him a massage as part of her household duties, she scheduled a masseuse to come to the house, but that after one visit Rogers said it was not convenient to have someone else come in and

23

insisted that Brindle could massage him herself. After she gave him four or five massages over a four-to-six-month period, Brindle said, during a massage,

> Mr. Rogers forced my hand on his penis and required me to masturbate him. And in that split second, you make a decision. Do I keep my job? My boss is requiring me to do that. What do I do? At that time, my only choice was to keep my job and do what he wanted me to do.

When asked if Rogers said that he would fire her if she did not masturbate him, Brindle said, "he did not verbally say that, no. . . . I believe by his actions and his intimidation, it was my belief that if I did not, my job was in jeopardy."

While Rogers characterizes Brindle's counterclaim against him in *Cobb 1* as only a personal matter rather than an issue of public interest or concern,

> a party's subjective belief is not the standard for determining whether the verification requirements of the anti-SLAPP statute apply. Rather, the statute applies to any claim arising from any act that "could *reasonably* be construed" as one done in furtherance of the right of free speech or the right to petition government for a redress of grievances in connection with an issue of public interest. (Emphasis supplied.) OCGA § 9-11-11.1 (b).

*Barnett*, 338 Ga. App. at 297.

Considering the evidence of record, and reading Roger's complaint in the light most favorable to him, the trial court did not err in finding that the complaint arose from Brindle's actions that could reasonably be construed as furthering Brindle's right to petition the government for redress of grievances in connection with an issue of public interest or concern.

(ii) *Claims of Tortious or Criminal Conduct.* Rogers also argues that his claims that Dupree committed tortious and criminal conduct insulate his complaint from the protections of the anti-SLAPP statute. While the complaint includes extensive facts about Brindle's counterclaims and the related litigation, Rogers now argues that those facts were only background information for his claims against the lawyers based primarily on the video, the demand letter, and the publicity that arose after he filed suit against Brindle.

More specifically, Rogers' theory of liability as to why his claims against Dupree fall outside the protections of OCGA § 9-11-11.1 is that Dupree joined a "civil conspiracy" by entering into an attorney-client relationship with Brindle after Cohen and Butters committed criminal and tortious acts related to the video and the demand letter. It was Dupree's failure to "shut this down," "this" being the use of the video in

25

prosecuting Brindle's claims, Rogers argues, that makes Dupree liable for the acts that occurred before he became Brindle's lawyer.

OCGA § 9-11-11.1 does not encompass every statement or action that touches on matters of public concern, only those that "relate to an official proceeding." *Berryhill v. Ga. Community Support & Solutions,* 281 Ga. 439, 442 (638 SE2d 278) (2006) (reversing trial court's denial of motion to dismiss because no related official proceeding when defendant made allegedly libelous statements). And the Georgia Supreme Court held that a trespass claim survived a motion to dismiss under OCGA § 9-11-11.1 for failure to file a verification. *Denton v. Browns Mill Dev. Co.*, 275 Ga. 2, 6-7 (561 SE2d 431) (2002). The trial court in *Denton* dismissed the plaintiff's complaint in its entirety because the plaintiff completely failed to file a verification. This Court reversed the dismissal of the trespass claim in the complaint, holding that the claim *as alleged* did not require verification under the anti-SLAPP statute to withstand the defendant's motion to dismiss. *Browns Mill Dev. Co. v. Denton*, 247 Ga. App. 232, 234 (1) (b) (543 SE2d 65) (2000). The Georgia Supreme Court affirmed, because "causes of action that are not based on an act in furtherance of the rights of free speech or petition do not fall under the statute," *Denton*, 275 Ga. at 6, and the trespass claim, "as alleged here," fell within that category. Id. at 3.

26

The court in *Denton* did not hold, however,

> that any lawsuit alleging intentional conduct by a defendant falls outside the purview of OCGA § 9-11-11.1. Rather, *Denton* merely holds that the defendant's alleged unlawful trespass onto the plaintiff's land under the facts of that particular case did not constitute "an act in furtherance of the right of free speech or the right to petition government" and, therefore, fell outside the stated purpose of the statute. [*Denton*, 275 Ga.] at 6 (punctuation omitted).

*Hindu Temple & Community Center of the High Desert, Inc. v. Raghunathan*, 311 Ga. App. 109, 115 (1), n. 21 (714 SE2d 628) (2011).

The procedural posture of this case differs from that in *Denton*, because Rogers did verify his complaint. We are not considering whether a portion of an unverified complaint may survive, as the courts were in *Denton*. More importantly, all of Rogers' allegations against Dupree involved litigation-related activity. In granting Dupree's motion to dismiss, the trial court noted that Brindle's counterclaims in *Cobb 1*, asserted by Dupree as her attorney, "were certainly made before or to a judicial proceeding." Accordingly, we find no error in the trial court's finding that Rogers' complaint against Dupree fell within the protection of the anti-SLAPP suit statute.

2. *The Application of OCGA § 9-11-11.1 to Rogers' Claims against Butters and Cohen.* Rogers did not cross-appeal the trial court's finding that the anti-SLAPP

statute applied to Rogers' complaint against Butters and Cohen. Therefore, this Court is foreclosed from considering whether the trial court did erred in finding that OCGA § 9-11-11.1 also applies to Rogers' complaint against Butters and Cohen.

3. *Substantive Consideration of the Verifications.* The next issue for review is whether the trial court erred in finding that the statutory verifications by Rogers and his counsel were false as to Dupree, but not as to Cohen and Butters.

As previously noted, "merely meeting the description of a claim which comes within the purview of the anti-SLAPP statute does not require dismissal." *Harkins*, 278 Ga. at 455-456 (2). If the trial court determines that the statute applies and that the plaintiff has complied with the procedural requirements of filing a verification, the court must then "take a substantive look at the verification offered to ensure that the underlying lawsuit has not been initiated for an improper purpose." Id. at 454 (2). Dismissal is authorized if the claim infringes on the right to petition as defined by the statute. Id. at 454 (1).

The trial court here found that when Rogers filed this complaint against the lawyers, *Cobb 1* had been ongoing for more than 20 months, and that a significant record had been developed in that case. The trial court also found that "[t]he central historical event to the claims in the *Cobb 2* complaint is the making of the June 20,

2012 video," noting that Rogers did not specifically identify in his complaint which alleged acts applied to which defendants, despite the trial court's previous directive to do so. «**1372-1373, 1383**»

(i) *R* The trial court found that Rogers had relied heavily on the court's previous discovery order in *Cobb 1* to formulate the allegations in this complaint, even attaching a copy of the order to his complaint, but observed that the court had determined in that order that Dupree had not been involved in the case when the disputed video was made. Rogers offered no evidence to the contrary, the trial court concluded. Additionally, Rogers presented no evidence that Dupree was involved in the case when the demand letter was sent to Rogers.

Rogers sought to hold Dupree liable for all of Rogers' claims under a civil conspiracy theory, under which Dupree became liable for his fellow conspirators' prior wrongful acts. But the acts that Rogers cited as proof that Dupree had joined the conspiracy, the trial court said, "were nothing more than his representation of his client": attending a pre-litigation meeting, sending a copy of the video to opposing counsel upon request, attending mediation, and litigating a lawsuit. These actions, the trial court concluded, did not constitute evidence that Dupree had joined in a conspiracy.

To recover damages based on a civil conspiracy, a plaintiff must show that two or more persons combined either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. The conspiracy of itself furnishes no cause of action. The gist of the action is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage.

The essential element of the alleged conspiracy is proof of a common design establishing that two or more persons in any manner, either positively or tacitly, arrive at a mutual understanding as to how they will accomplish an unlawful design. After the conspiracy is formed, members of the conspiracy are jointly and severally liable for acts of co-conspirators done in furtherance of the conspiracy.

*McIntee v. Deramus*, 313 Ga. App. 653, 656 (722 SE2d 377) (2012) (citations and punctuation omitted).

Here, the trial court concluded that Rogers could not have reasonably believed that his claims against Dupree were grounded in fact and law, and also concluded that the claims were interposed for the improper purpose of depriving Brindle of her counsel and suppressing her right to petition the government for redress. Additionally, the trial court found that, absent evidence Dupree had leaked any information to the media, Rogers' claim that Dupree was liable for intentional infliction of emotional distress in that regard also violated the anti-SLAPP statute.

30

While it is true that a latecomer to a conspiracy may be liable for his co-conspirators' previous wrongful acts, "where the act of conspiring is itself legal, the means or method of its accomplishment must be illegal." *Savannah College of Art & Design v. School of Visual Arts of Savannah*, 219 Ga. App. 296, 297 (464 SE2d 895) (1995). Rogers argues essentially that Dupree's representation of Brindle was illegal, and as paraphrased by Dupree, that "[t]he conspiracy is using the evidence at hand to prosecute claims against [Rogers] in spite of the fact that [Rogers] believes that evidence was procured illegally."

In an appeal affirming the grant of summary judgment to a defendant in a tortious interference with contract suit based on the filing of another suit, this Court held that Georgia has "a compelling government interest in encouraging citizens to settle disputes through the court, rather than through self-help which can foster prolonged acrimony and even violence among otherwise peaceable citizens." *Phillips v. MacDougald*, 219 Ga. App. 152, 157 (2) (g) (464 SE2d 390) (1995).[12] And in this

---

[12]While *Phillips*, 219 Ga. App. 152, was not an anti-SLAPP case, we cited it in the anti-SLAPP appeal in *Hagemann*, 290 Ga. App. at 682. This Court in *Hagemann* reversed the trial court's denial of a defendant's motion for attorney fees after the trial court found that the plaintiff's verification violated the anti-SLAPP statute, holding that OCGA § 9-11-11.1 (b) made the imposition of sanctions mandatory upon such a finding. Id. at 683.

case, in considering the proposition that a conspirator can be liable for acts committed before he joined the conspiracy, the trial court held,

> The Court can find no case in American jurisprudence where that proposition has been used to sue lawyers when their client is alleged to have violated the law or committed a tort prior to their involvement. . . . [A] lawyer should not have to worry about being added to litigation as a co-conspirator every time he or she takes on a new client. This is exactly what the anti-SLAPP statute is designed to prevent.

A plaintiff cannot use a conspiracy theory to hold an attorney liable for joining a legal team and advocating for his client. The trial court committed no error in determining that the verifications of Rogers and his attorney were false because the claims against Dupree were interposed for the improper purpose of suppressing Brindle's right to petition the government for redress.

(ii) *Rogers' Claims against Butters and Cohen.* The trial court found that the verifications of Rogers and his counsel regarding the claims against Cohen and Butters were not false, and denied their motion to dismiss the complaint pursuant to the anti-SLAPP statute. Cohen and Butters argue that the trial court erred in denying their motion to dismiss the complaint for violating the anti-SLAPP statute and that, contrary to the verifications, Rogers' complaint was filed for the improper purpose of chilling

32

Brindle's right to sue Rogers for her job-related sexual harassment claims by suing her lawyers. They also argue that the trial court erred in failing to sanction Rogers for breaching the parties' mediation agreement, erred in holding that the abusive litigation statute did not apply to pre-litigation conduct to bar Rogers' claims, and erred in failing to dismiss Rogers' complaint under the *Noerr-Pennington* doctrine.[13]

After the evidentiary hearing on the defendant lawyers' motions to dismiss under the anti-SLAPP statute, the trial court found that all of Rogers' claims were related, directly or indirectly, to the video Brindle made of herself and Rogers and to the demand letter from Cohen and Butters to Rogers. The trial court further found, "Given the record in *Cobb 1* and the evidence presented in this case, it would be reasonable

---

[13] The *Noerr-Pennington* doctrine derives from the Petition Clause of the First Amendment and provides that those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." It initially emerged in the antitrust context, . . . [but] "the Supreme Court has since held that *Noerr-Pennington* principles apply with full force in other statutory contexts outside antitrust.

*Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643-644 (III) (A) (9th Cir. 2009) (citations and punctuation omitted).

33

for Rogers and his counsel to conclude that the making of the June 20, 2012 video and use and possession of the camera disguised as a cell phone was illegal," and "to conclude that Cohen's and Butters' assistance was obtained in furtherance of Brindle's illegal activities and was closely related to it."[14] The trial court also found it reasonable for Rogers and his counsel to have concluded that "the July 16, 2012 letter was unlawful, and not merely a run-of-the-mill 'demand letter,'" that "the making of the video and the demand/extortion letter . . . are not privileged and are not protected under OCGA § 51-5-7 (4)," that Rogers and his counsel had a reasonable belief that the claims against Butters and Cohen were grounded in fact and warranted by existing law, and that the complaint was not imposed for an improper purpose.

Additionally, the trial court found that Rogers' intentional infliction of emotional distress claim arose from allegations that Cohen and Rogers leaked information to the media about the case. Consequently, it found that it was reasonable for Rogers and his counsel to conclude that the lawyers' actions prompted a news story that led to widespread public dissemination about the matter and "to believe that the media leaks

---

[14]The court also noted that it had made no findings in the *Cobb 1* discovery order as to Cohen and Butters' involvement in the making of the video, but had simply allowed discovery on that issue.

34

and resulting publicity supported certain aspects of [Rogers'] claim as to Cohen and Butters."

Accordingly, based on Brindle having made the video of herself and Rogers without his knowledge, Cohen and Butters having sent Rogers a prelitigation offer to settle and avoid dire consequences that had befallen other high-profile defendants who had failed to do so, and the media having received anonymous leaks about the existence of Brindle's claims, the trial court denied Cohen and Butters' motion to dismiss the complaint for violating the anti-SLAPP statute. I will thus examine these allegations on which the trial court relied to deny Cohen and Butters' motion to dismiss.

Rogers argues that the trial court properly refused to dismiss his claims against Butters and Cohen alleging criminal activity because those claims do not come within the protection of the anti-SLAPP statute, based on *Browns Mill Dev. Co. v. Denton*, 247 Ga. App. 232, affirmed, *Denton v. Browns Mill Dev. Co.*, 275 Ga. 2. As noted previously in Division 4, however, Rogers did not cross-appeal the trial court's finding that the anti-SLAPP statute applied to his claims against Butters and Cohen. Further, as addressed previously in Division 3 (b), when considering whether Rogers' claim

against Dupree came within the statute's protection, the procedural posture of this case differs from that in *Denton* because here, Rogers did verify his complaint.

The issue for consideration under Butters and Cohen's motion to dismiss under the anti-SLAPP statute is not whether the claims against Butters and Cohen were entitled to the protection of the statute, but whether the verifications by Rogers and his counsel were true. The verifications affirmed that the complaint against Butters and Cohen was well grounded in fact and law, was not based on a privileged communication, and was "not interposed for any improper purpose such as to suppress a person's . . . right of free speech or right to petition government, or to harass, or to cause unnecessary delay or needless increase in the cost of litigation." OCGA § 9-11-11.1 (b).

The trial court found that the claims against Butters and Cohen all stem from the making of the June 2012 video and the sending of the July 2012 letter. If those actions cannot form the basis for claims against Butters and Cohen, then the verifications of Rogers and his counsel that the claims are well-grounded in current law or a good-faith argument for the extension or modification of law are "false" and the trial court erred in failing to dismiss the complaint.

(a) *The July 16, 2012 Letter.* An allegation of criminal conduct does not necessarily remove a case from the protections of the anti-SLAPP statute. *Hindu Temple*, 311 Ga. App. at 315 (1), n. 21. While Rogers alleges that the July 2012 letter constitutes attempted extortion, OCGA § 24-4-408 (b) provides that "[e]vidence of conduct or statements made in compromise negotiations or mediation shall not be admissible" in evidence. This code section is based on Federal Rule of Evidence 408, and the letter sent to Rogers in July 2012 states that it was sent to Rogers "pursuant to FRE 408 for purposes of settlement and compromise."

Further, before beginning the formal mediation proceeding with the mediator of Rogers' choice, all parties and their attorneys signed an agreement that included the following provision: "CONFIDENTIAL AND PRIVILEGED. All that occurs during the mediation process shall be confidential and may not be recorded, and shall not be revealed in any subsequent legal proceedings or otherwise. All Parties agree not to institute any action based on the mediation. . . ."

Cohen and Butters argue that the trial court erred in finding that Rogers' verification was not false because "threatening" someone with a lawsuit is not duress and is not actionable in tort. Butters and Cohen further argue that the trial court erred

37

in failing to dismiss Rogers' claims based on a breach of the parties' mediation agreement.

Cohens and Butters are correct. First, neither the prelitigation letter nor statements made during the mediation process are admissible in evidence per OCGA § 24-4-408. "The purpose of this Code section is to encourage settlements and protect parties who freely engage in negotiations directed toward resolution of lawsuits." *Computer Communications Specialists v. Hall*, 188 Ga. App. 545, 546 (1) (373 SE2d 630) (1988) (citation and punctuation omitted) (construing former OCGA § 24-3-37, the predecessor to OCGA § 24-4-408, which stated that "propositions made with a view to a compromise are not proper evidence."). In reversing a theft by taking conviction because the trial court admitted evidence that the defendant had agreed in mediation to pay the funds he was accused of stealing, this Court observed,

> The policy [behind court-ordered mediation] is to encourage settlements, but admission of statements made during negotiations tends to defeat that objective. Unless the programs can assure confidentiality, the programs will be unable to create the atmosphere of openness that is necessary for successful dispute resolution. . . . The integrity of mediation programs is in jeopardy, however, without confidentiality for the proceedings.

*Byrd v. State*, 186 Ga. App. 446, 448 (2) (367 SE2d 300) (1988) (citation and punctuation omitted).

While this mediation proceeding was not court-ordered, but conducted by agreement of the parties, the principle of assuring confidentiality during such proceedings is necessary for successful alternative dispute resolution. Numerous cases from this Court have held that letters from attorneys written with a view toward settlement and compromise are inadmissible in evidence.[15] See also *Citadel Corp. v. Sun Chem. Corp.*, 212 Ga. App. 875, 877 (2) (443 SE2d 489) (1994) ("Settlement negotiations are not admissible in evidence," also decided under former OCGA § 24-3-37.). Further, "an offer to compromise a disputed claim . . . is no more admissible in pleading than in evidence." *Malcolm v. Dobbs*, 127 Ga. 487, 491 (56 SE 622) (1907) (decided under former Civil Code 1895, § 5194).

---

[15]See, e.g., *Nevitt v. CMD Realty Inv. Fund IV, L.P.*, 282 Ga. App. 533, 535 (1) (639 SE2d 336) (2006) ("OCGA § 24-3-37 was created in order to encourage settlements by letting a party which makes [a] . . . proposition with a view toward compromise rest assured that its good-faith settlement attempt will not later be used against it in court." (Citation omitted.)); *McDevitt & Street Co. v. K-C Air Conditioning Serv.*, 203 Ga. App. 640, 647 (8) (418 SE2d 87) (1992), cert. denied, *Employers Ins. of Wausau v. McDevitt & Street Co.*, Case No. S92C0888 ("Correspondence from plaintiff's former attorney, written within the context of good faith negotiations, was properly excluded. OCGA § 24-3-37.").

The July 2012 prelitigation demand letter to Rogers was an offer to settle a disputed claim. Not only is evidence of the letter and of Brindle's demand for $12 million during the mediation proceeding inadmissible as efforts to compromise a claim, "[t]he 'threats' associated with institution of a civil action cannot and do not constitute duress and are not actionable in tort." *Rolleston v. Huie*, 198 Ga. App. 49, 51 (2) (400 SE2d 349) (1990), overruled in part on other grounds, *Sewell v. Cancel*, 295 Ga. 235, 239, n. 2 (759 SE2d 485) (2014) (citation and punctuation omitted).

In *Rolleston*, this Court affirmed a judgment on the pleadings in a claim brought by one lawyer against another lawyer who had "threatened" to file a counterclaim for legal malpractice if the plaintiff sued a client for attorney fees. 198 Ga. App. at 50. The plaintiff alleged that this "threat" was "an unlawful attempt to disseminate information tending to impair appellant's credit or business and professional repute in violation of OCGA § 16-8-16 (a) (3)."[16] *Rolleston*, 198 Ga. App. at 50 (2).

> The most that can be said for appellant's allegations is that they purport
> to state a tort claim against [the lawyer and his firm] under the theory that

---

[16] "A person commits the offense of theft by extortion when he unlawfully obtains property of or from another person by threatening to . . . [d]isseminate any information tending to subject any person to hatred, contempt, or ridicule or to impair his credit or business repute." OCGA § 16-8-16 (a) (3).

the "threat" constituted the intentional infliction of emotional distress. However, it is clear that the mere filing of a lawsuit is not the type of humiliating, insulting or terrifying conduct which will give rise to a claim for the intentional infliction of emotional distress. Since the actual filing of a lawsuit, standing alone, does not give rise to a viable claim for the intentional infliction of emotional distress, the mere "threat" to file a lawsuit certainly does not. The "threats" associated with institution of a civil action cannot and do not constitute duress and are not actionable in tort.

Id. at 51 (2) (citations and punctuation omitted).

Accordingly, neither the July 16, 2012 letter nor the monetary demand made during the parties' confidential mediation proceedings can serve to underpin Rogers' claims against Butters and Cohen.

b. *The June 2012 Video*. Besides the July 16, 2012 letter, the trial court found that the video Brindle made of herself and Rogers underlay all of Rogers' claims against Cohen and Butters. Rogers has already sued Brindle in *Cobb 1* for making that video, and that litigation is on hold pending the Georgia Supreme Court's consideration of Butters and Cohen's application for a writ of certiorari from this court's July 2016 opinion affirming the trial court's disqualification of them as Brindle's counsel in *Cobb 1*. *Cohen v. Rogers*, 338 Ga. App. 156. Here, Rogers

alleges a duplicate claim against Butters and Cohen for encouraging or assisting Brindle in making the video.

Again, no court or jury has determined that the making of the video was illegal. As Judge McFadden explains in his dissent in this case, case law supports the conclusion that no one committed any crimes related to the video. And regardless, "the trial court's interim discovery order in *Cobb 1* did not adjudicate dispositively the question of whether Brindle violated a criminal statute by making the video recording of herself and Rogers." *Cohen v. Rogers*, 338 Ga. App. at 161 (1). Contrary to Rogers' repeated assertions, therefore, the issue of the video's legality is unsettled. The trial court in *Cobb 1,* affirmed by this Court in *Brindle v. Rogers*, 328 Ga. App. XXIV, found only that Rogers presented a prima facie case that allowed him to ask Brindle limited discovery questions that would otherwise be barred by the attorney-client privilege. Id.

Rogers has referred to indictments against the lawyers as support for his contention that his complaint against them is not based on litigation conduct but on crimes. He again referred to the indictments in arguing that attempted extortion is a crime. The trial court noted during a May 2015 status conference that the court reporter had received a request from the Fulton County District Attorney's office for

42

a copy of the previously-sealed ex parte crime-fraud hearing in *Cobb 1*, and told the parties that the court reporter was instructed to inform the inquirer that the hearing transcript could not be released because it was sealed. And, as previously mentioned, the record includes evidence that Rogers and his lawyers visited the Fulton County D.A. after inviting the defendants to mediate Brindle's claims and subsequently shared with the D.A. the lawyers' research into possible criminal charges against Brindle and her mother.

Cohen and Butters moved this Court for leave to file a supplemental brief in their appeal, directing attention to a written order entered by a Fulton County trial court on November 30, 2016, dismissing all indictments against Brindle, Butters, and Cohen, which included charges of conspiracy to commit theft by extortion and crimes of unlawful surveillance. Rogers responded that the State has filed a notice of appeal to the Georgia Supreme Court regarding that order of dismissal.[17]

Regardless of the existence and dismissal of the indictments, this Court's review is limited to the appellate record. See *Tingle v. Arnold*, 129 Ga. App. 134, 139 (2)

---

[17]The appeal of that criminal case had not been docketed in the Supreme Court when this opinion was published.

(199 SE2d 260) (1973). The point is simply that the legality of the video remains hotly contested.

Additionally, whether the attorneys' alleged actions violated a criminal statute or not and whether those allegations remove the complaint from the protections of the anti-SLAPP statute, I would find that an alleged violation of a criminal statute does not necessarily translate to a civil cause of action. In responding to a certified question from the United States Court of Appeals for the Eleventh Circuit, the Georgia Supreme Court observed that

> civil liability may be authorized where the legislature has indicated a strong public policy for imposing a civil as well as criminal penalty for violation of a penal statute. . . . [T]he indication that the legislature meant to impose a civil as well as criminal penalty must be found in the provisions of the statute at issue, not extrapolated from the public policy the statute generally appears to advance.

*Anthony v. American General Financial Services*, 287 Ga. 448, 455 (2) (a) (697 SE2d 166) (2010) (citation and punctuation omitted) (concluding that no civil cause of action exists for the misdemeanor of overcharging for notary public services). See also *Bergstein v. Stroock & Stroock & Lavan LLP*, 187 Cal. Rptr. 3d 36, 45 (Cal. Ct. App. 2015).

For example, a statute criminalizing the failure of school employees to report to authorities the identity of a student suspected of certain criminal acts does not create a civil cause of action for victims hurt by the suspected student. *Murphy v. Bajjani*, 282 Ga. 197, 200-201 (2) (647 SE2d 54) (2007). The enactment of a criminal stalking statute did not create a tort of stalking. *Troncalli v. Jones*, 237 Ga. App. 10 (1) (514 SE2d 478) (1999). The statute mandating the reporting of suspected child abuse to authorities did not create a tort benefitting the abused child. *Vance v. T. R. C.*, 229 Ga. App. 608, 610-611 (1) (a) (494 SE2d 714) (1997).

More relevant here, less than a year ago this Court reversed a trial court's award of compensatory and punitive damages based on a defendant's counterclaim for "Intentional Tort (OCGA § 16-11-90)." *Somerville v. White*, 337 Ga. App. 414, 415 (787 SE2d 350) (2016). The trial court found for the plaintiff in the defendant's counterclaims for breach of contract, intentional infliction of emotional distress, invasion of privacy, defamation, but awarded the defendant $500 in general damages and $15,000 in punitive damages, based on the claim that the plaintiff, who was the defendant's former boyfriend, accessed the defendant's email account and "forwarded nude and sexually explicit photographs of her to over 300 of her e-mail contacts. Id. The defendant also contended that the plaintiff had uploaded similar

45

photographs to one of her social media accounts, all in violation of OCGA § 16-11-90. Id.

OCGA § 16-11-90 provides that

[a] person violates this Code section if he or she, knowing the content of a transmission or post, knowingly and without the consent of the depicted person[,] [e]lectronically transmits or posts . . . a photograph or video which depicts nudity or sexually explicit conduct of an adult when the transmission or post is harassment or causes financial loss to the depicted person and serves no legitimate purpose to the depicted person.

OCGA § 16-11-90 (b) (1). Subsection (b) (1) further criminalizes *causing* such a transmission or post. In reversing the trial court's award to the woman following a bench trial, this Court observed that the criminal statute did not expressly provide for a private right of action, which was "fatal to her claim." Id. at 416 (1).

Rogers has framed his claims against Butters and Cohen not as direct violations of criminal statutes, but rather as a conspiracy to violate the RICO act and violation of the RICO act, as well as claims for intentional infliction of emotional distress, general negligence, and "aiding and abetting breach of confidential relationship," among others. But since the trial court found that "the gravamen" of all his claims were the July 2012 letter and the June 2012 video, if those acts cannot serve as the basis for

46

his claims, then his verification that his complaint was well-grounded on existing law or a good-faith attempt to extend the law, or that his complaint was not brought to chill Brindle's right to petition the government for redress, must be false.

Rogers' claims are not actionable for three reasons. First, OCGA § 16-8-16, prohibiting theft by extortion, does not create a private cause of action in tort. *Rolleston*, 198 Ga. App at 50-51 (2). Second, sending a prelitigation offer to settle a disputed claim is not actionable. Finally, offers made during a mediation proceeding which the parties agreed would remain confidential are also not actionable and are inadmissible in evidence.

Rogers bases all of his claims against Brindle's lawyers on Brindle having made the video of herself and Rogers, which Rogers argues was used in a scheme to try to extort money from him. Conversely, the gravamen of Brindle's claim against Rogers is that she was allegedly required to participate in these sexual acts in order to keep her job, and she testified in *Cobb 1* that she took the video to prove her claims against Rogers. The tension between the facts as Rogers sees them and the facts as Brindle sees them is being litigated in *Cobb 1*. Rogers' parallel claims against Brindle's lawyers are not well-grounded in fact and law and constitute attempts to chill Brindle's right to petition for redress. The trial court erred in denying Butters and Cohen's

motion to dismiss the complaint for violation of the anti-SLAPP statute, and I dissent to the majority's finding otherwise.

3. Finally, Rogers' claims are also pre-empted by the exclusive remedy provision of OCGA § 51-7-85, and the trial court erred in denying the defendant lawyers' motions to dismiss on that ground. Rogers contends that his claims are based on pre-litigation torts and criminal conduct that are not preempted by the abusive litigation statute. I conclude that because Rogers' claims against his opposing party's lawyers are rooted in their litigation activity, the exclusive remedy provision of the abusive litigation statute applies to bar his claims at this stage of the case between Rogers and Brindle, and the trial court erred in denying the lawyers' motion to dismiss on that ground.

Georgia's abusive litigation statute provides that "[a]ny person who takes an active part in the initiation, continuation, or procurement of civil proceedings against another shall be liable for abusive litigation if such person acts: (1) With malice; and (2) Without substantial justification." OCGA § 51-7-81. "[N]o claim other than as provided in this article or in Code Section 9-15-14 shall be allowed, whether statutory or common law, for the torts of malicious use of civil proceedings, malicious abuse

48

of civil process, nor abusive litigation. . . . This article is the exclusive remedy for abusive litigation." OCGA § 51-7-85.

Whether a claim is one for abusive litigation depends on the substance of the claim rather than its style. *Meadow Springs Recovery, LLC v. Wofford*, 319 Ga. App. 79, 82 (1) (734 SE2d 100) (2012). For example, two dispossessed tenants sued the lawyer who brought the dispossessory action against them, among other defendants, claiming to be "the victims of a conspiracy to bolster the fortunes of a property management company that unjustly enriches itself by illegally dispossessing tenants." *Slone v. Myers*, 288 Ga. App. 8, 9 (653 SE2d 323) (2007), overruled on other grounds, *Reeves v. Upson Regional Med. Center*, 315 Ga. App. 582 (726 SE2d 544) (2012). The trial court properly dismissed the claim because the tenants failed to give the lawyer proper notice under the abusive litigation statute.[18] Id. at 11 (2). Although

---

[18]     As a condition precedent to any claim for abusive litigation, the person injured by such act shall give written notice by registered or certified mail or statutory overnight delivery or some other means evidencing receipt by the addressee to any person against whom such injured person intends to assert a claim for abusive litigation and shall thereby give the person against whom an abusive litigation claim is contemplated an opportunity to voluntarily withdraw, abandon, discontinue, or dismiss the civil proceeding, claim, defense, motion, appeal, civil process, or other position. Such notice shall identify the civil proceeding,

the former tenants sued "for torts other than abusive litigation, specifically a pattern of racketeering activity with predicate acts of perjury, forgery, and theft[,] . . . [t]he wrongful acts which they allege . . . all occurred during litigation of the dispossessory action," and they could not avoid the requirements of the statute merely by characterizing their claims arising from the allegedly abusive lawsuit as some other cause of action. Id. at 11 (2).

The abusive litigation statutes strike a balance between the competing public interests of preserving free access to the court and preventing "serious abuses of lawsuit filing." *Phillips v. MacDougald*, 219 Ga. App. 152, 156 (2) (g) (464 SE2d 390) (1995). This balance is intended to prevent the "proliferation of unnecessary causes of action for the alleged improper filing of lawsuits [which] would have a chilling effect on the exercise by citizens of their right of access to the courts." Id.

Here, Rogers argued, and the trial court found, that the abusive litigation statute does not include claims that involve prelitigation activity, citing *Ward v. Coastal*

---

claim, defense, motion, appeal, civil process, or other position which the injured person claims constitutes abusive litigation.

OCGA § 51-7-84 (a).

50

*Lumber Co.*, 196 Ga. App. 249 (395 SE2d 601) (1990). That case is inapplicable here, however, because there, the plaintiff's claims "relate[d] *solely* to appellee's pre-litigation actions." Id. at 251 (3) (original emphasis omitted, additional emphasis supplied). Although Rogers argues that his claims are really based only on prelitigation actions, the complaint belies that contention.

The initiation of a lawsuit necessarily involves some prelitigation activity. In reviewing a claim for damages under the abusive litigation statute, this Court observed the following almost 20 years ago.

> Although good faith is defined in subjective terms to the extent it refers to the best of a person's or his or her attorney's knowledge, information, and belief, formed honestly, an attorney cannot establish that he or she acted in good faith by simply asserting a subjective, honest belief that a claim was well grounded in fact and warranted by existing law or by reasonable grounds to believe that an argument for changing the law may be successful. The "reasonable inquiry" requirement of § 51-7-80 (4) is an objective good faith requirement which qualifies the definition and imposes a duty on attorneys to conduct a reasonable inquiry into the facts and law prior to initiating, continuing, or procuring a claim on behalf of a client. Accordingly, the applicable standard is what would be objectively reasonable for a competent attorney under the circumstances.
>
> ... The attorney's continuing duty under the reasonable inquiry requirement is to pursue discovery or investigation, and, if sufficient

51

> support is not developed after a reasonable opportunity for discovery or investigation, then dismiss, withdraw, abandon, or discontinue the claim. Of course, an abusive litigation claim would be appropriate where an attorney files a claim on behalf of a client without any factual or legal support or supported only by guess or sheer speculation, or in cases where a claim having arguable factual or legal support is filed in good faith for the purpose of pursuing discovery, but continued by the attorney after discovery reveals there is no basis for the claim.

*Kendrick v. Funderburk*, 230 Ga. App. 860 864-865 (3) (498 SE2d 147) (1998) (citations and punctuation omitted).

For example, this Court affirmed the dismissal of claims against lawyers based on their filing a lis pendens and delivering a copy of it to a bank, finding the claims were preempted by the abusive litigation statute. *Meadow Springs Recovery, LLC v. Wofford,* 319 Ga. App. 79 (734 SE2d 100) (2012). The defendants, "as attorneys representing their clients, were tak[ing] an active part in the initiation and continuation of civil proceedings both in filing the lis pendens and in delivering a copy to a third party with an interest in the subject property." Id. at 83 (1) (punctuation omitted). Therefore, the claims against them should have been brought under the abusive litigation statute and were preempted by the exclusivity provision OCGA § 51-7-85. Id. at 84 (1)

Here, regardless of how the defendants' pre-litigation actions are characterized, they were a prequel to litigation. After the claims between the parties are tried, then Rogers might or might not have a claim for abusive litigation against her lawyers. At this point, allowing this lawsuit to go forward before any fact-finders have considered the merits of the underlying litigation is premature.

For these reasons, I respectfully dissent to the majority opinion.

A16A1714. ROGERS v. DUPREE et al.

A16A1715. DUPREE et al. v. ROGERS.

A16A1716. COHEN et al. v. ROGERS.

A16A1717. COHEN et al. v. ROGERS.


McFADDEN, Presiding Judge, concurring in part and dissenting in part.

I concur in Division1. Because the majority advances Rogers's extraordinary and unwarranted success in inverting and distorting this litigation and because the majority's grave errors have broad implications for the practice of law and contravene public policy declared by the General Assembly in § 9-11-11.1 (a), the introductory paragraph of the statute prohibiting strategic lawsuits against public participation (SLAPP), I respectfully but emphatically dissent in the remaining divisions.

This is — or ought to be — a straightforward sexual harassment case. It is undisputed that for a number of years, while Brindle was employed as Rogers's housekeeper, they regularly engaged in sexual activities. She is a single mother with a two-year degree in cosmetology. He is a wealthy executive and heir to a fortune. She

is some twenty years his junior. Apart from those activities, the parties' relationship bore the characteristics of an employment relationship rather than a romantic one. When she became badly injured, he fired her. He later rehired her, and the sexual activities eventually resumed. He says those activities were consensual. She says they were a condition of employment.

Brindle's counsel sent a demand letter to Rogers. Rogers proposed pre-suit mediation, and Brindle agreed. But it appears that Rogers sought mediation only to elicit a settlement demand for use in his preemptive lawsuit — which he filed during the mediation.

The central premise of his lawsuit is the untenable proposition that the demand letter constitutes extortion. We have squarely rejected such claims.

> Under Georgia law, threats to take legal action provide no basis for duress and are not actionable in tort. *Fields v. Thompson*, 164 Ga.App. 331, 297 S.E.2d 100. This court has concluded that an act must be wrongful to constitute duress and it is not duress to threaten to do what one has a legal right to do. The threat to bring a civil proceeding against the person is not duress in a legal sense. *Cannon v. Kitchens*, 240 Ga. 239, 240 S.E.2d 78; *Stroup v. Robbie Jon Dev. Corp.*, 159 Ga.App. 652, 284 S.E.2d 667. Thus we must conclude that the "threats" associated with institution of a civil suit cannot and do not constitute duress and are not actionable in tort.

2

*Mobley v. Coast House, Ltd.*, 182 Ga. App. 305, 307 (355 S.E.2d 686) (1987). See also *Brown v. State*, 322 Ga. App. 446, 454-455 (3) (745 SE2d 699) (2013); *DeLong v. State*, 310 Ga. App. 518, 523-524 (3) (714 SE2d 98) (2011); *Markowitz v. Wieland*, 243 Ga. App. 151, 155 (2) (c) (532 SE2d 705) (2000); *Rolleston v. Huie*, 198 Ga. App. 49, 50-51 (2) (400 S.E.2d 349) (1990).

We were right to reject them. Pre-suit settlements are an invaluable part of our civil justice system. Demand letters are indispensable to-pre suit negotiations. It is entirely proper for a demand letter to emphasize the collateral benefits of pre-suit settlement. Confidentiality is obviously one of those benefits. It is equally obvious that confidentiality is particularly salient to a prominent defendant whose conduct, even construed in his favor, would earn opprobrium. It is possible, of course, for a pre-suit demand letter to contain threats that do constitute extortion. For example a demand letter might explicitly threaten actions — apart from vigorous prosecution of the case — designed to effect such consequences. But there are no such threats in the demand letter before us, and such threats should not be lightly inferred. Drawing a prospective defendant's attention to the possible consequences of being involved in litigation is not such a threat. By holding that the author of a demand letter can be held liable for

extortion on the basis that the letter is too forceful, this court has committed grave error with broad consequences for the practice of law.

Nor should the focus of this case be on the titillating fact that Brindle videotaped a sex act between the parties. She contends that she did so in order to be able to prove in a court of law — or to discourage Rogers from denying — that the activities did occur. There is no evidence that she or her attorneys have used it or attempted to use it for any other purpose. There is no evidence that Brindle or any of her attorneys disseminated it, attempted to disseminate it, or threatened to disseminate it.

The majority declares that creating that recording was "tortious and criminal." In support of that declaration, the majority simply cites OCGA § 16-11-62 (2). The issue is not so simple.

Our Supreme Court has construed that statute, together with OCGA § 16-11-66(a), to adopt a participant's exception (sometimes called a one-party consent rule). *State v. Birge*, 240 Ga. 501 (241 SE2d 213) (1978); *Mitchell v. State*, 239 Ga. 3, 4-5 (235 SE2d 509) (1977) (plurality). It is true that we held the one party consent rule inapplicable to a videotape of sexual activities in *Gavin v. State*, 292 Ga. App. 402 (664 SE2d 797) (2008). But *Gavin* is a criminal case. OCGA § 16-11-62 (2) does not create a private cause of action. See *Gobran Auto Sales v. Bell*, 335 Ga. App. 873,

4

877 (2) (783 SE2d 389) (2016) (finding no private cause of action for violation of penal statute where statute did not expressly provide for such cause of action).

And "*Gavin* does not hold and cannot be reasonably understood to hold that the participant's exception set forth in OCGA § 16-11-66 (a) has no application to video recordings that satisfy the criteria of that statutory exception." *State v. Madison*, 311 Ga. App. 31, 34 (714 SE2d 714) (2011). Extending *Gavin* to this case would entail a determination that Rogers's had a right to privacy in his sexual activities with Brindle, to which she was subject, that overrides her right to prove her claim that those activities were sexual harassment. See *Sims v. State*, 297 Ga. 401, 402-403 n. 2 (774 SE2d 620) (2015); *Thomas v. State*, 263 Ga. 85, 87 (3) (428 SE2d 564) (1993); *Greene v. State*, 191 Ga. App. 149 (381 SE2d 310) (1989). See also *Katz v. United States*, 389 U. S. 347, 351 (88 SCt. 507, 19 LE2d 2d 576) (1967); *United States v. Thompson*, 811 F.3d 944, 949-950 (7th Cir. 2016).

The videotape may be inadmissible. See *Ransom v. Ransom*, 253 Ga. 656, 659 (3) (324 SE2d 437) (1985). But that issue is not ripe and may be moot. There has been no undertaking to admit the videotape into evidence. And there may never be, as Rogers has admitted in his deposition testimony that the activities did occur.

So Rogers's claims are due to be dismissed under the anti-SLAPP statute. Contrary to the majority, the General Assembly has made very clear that that statute extends to the pre-suit activities like those before us. The General Assembly has directed that when the anti-SLAPP statute comes before the courts, it "shall be construed broadly." OCGA § 9-11-11.1 (a). Its protection extends to "any act ... which could reasonably be construed as an act in furtherance of the person's or entity's right of petition[.]" OCGA § 9-11-11.1 (b) (1). That includes, "[a]ny written or oral statement or writing or petition made before a . . . judicial proceeding[.]" OCGA § 9-11-11.1 (c) (1). And, "[a]ny other conduct in furtherance of the exercise of the constitutional right of petition[.]" OCGA § 9-11-11.1 (c) (4).

The anti-SLAPP statute begins with findings.

> The General Assembly of Georgia finds and declares that it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech. The General Assembly of Georgia further finds and declares that the valid exercise of the constitutional rights of petition and freedom of speech should not be chilled through abuse of the judicial process.

OCGA § 9-11-11.1 (a).

In other words, the anti-SLAPP Act was implemented to prevent wealthy and powerful persons and institutions from using the threat of crushing litigation to shut

6

down efforts to hold them accountable. In this case, one of Rogers's lawyers, arguing that attorney Hylton Dupree should be sanctioned even though he entered his appearance for Brindle after the videotape had been created and the demand letter had been sent, let the cat out of the bag. Dupree, he argued, should have "shut this down."

Brindle's case should not be shut down. Perhaps a jury would be persuaded that any woman — single mother or not, limited other prospects or not — who was not a willing participant would have quit Rogers or at least not gone back to work for him. That is not for us to decide. Brindle should have her day in court. What ought to be shut down is the effort to deprive her of it.

By taking the opposite course, the majority gravely errs. The majority devalues what the General Assembly has declared to be a matter of "public interest," OCGA § 9-11-11.1 (a), in other words a matter of concern, gravity, and importance to the public.